UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTINA HERNANDEZ et al., | No. 2:24-cv-01983-DAD-AC |
| Plaintiffs, | |
| v. | ORDER DENYING DEFENDANTS' MOTIONS TO COMPEL ARBITRATION |
| EVENT TICKET CENTER, INC., et al., | (Doc. Nos. 51, 52) |
| Defendants. | |

This matter is before the court on defendants' motions to compel arbitration. (Doc. Nos. 51; 52.) On July 23, 2025, the pending motions were taken under submission on the papers pursuant to Local Rule 230(g). (Doc. No. 54.) For the reasons explained below, the court will deny defendants' motions to compel arbitration.

**BACKGROUND**

Plaintiff Kristina Hernandez initiated this action against Defendant Event Tickets Center, Inc. ("Defendant ETC") on July 19, 2024. (Doc. No. 1.) Plaintiff Julie Varon was added as a plaintiff in the first amended complaint, which was filed with leave of court, on April 9, 2025. (Doc. Nos, 35, 36.) Defendant ETC filed its first motion to compel arbitration on April 23, 2025. (Doc. No. 37.) On May 27, 2025, plaintiffs moved again to amend the complaint, in order to add Ticketnetwork, Inc. ("Defendant TN") as a defendant. (Doc. No. 42.) On June 4, 2025, the court granted that unopposed motion to amend the complaint. (Doc. No. 44.) Plaintiffs filed their

1

second amended complaint ("SAC") on June 5, 2025.  (Doc. No. 45.)  In their SAC, plaintiffs assert the following claims:  (1) violation of California's False Advertising Law, Business & Professions Code §§ 17500 et. seq.; (2) violation of California's Consumer Legal Remedies Act; (3) violation of California's Unfair Competition Law; and (4) "quasi-contract" seeking restitution.  (Doc. No. 45 at ¶¶ 54–99.)  On June 6, 2025, the court denied defendant ETC's first motion to compel arbitration as having been rendered moot by plaintiffs filing of their second amended complaint.  (Doc. No. 46.)

On July 11, 2025, defendants ETC and TN filed motions to compel arbitration and to dismiss in favor of arbitration, contending that plaintiffs entered into valid arbitration agreements when they purchased concert tickets on the website www.eventicketcenter.com.  (Doc. Nos. 51 at 8, 12; 52 at 8.)  Defendants ETC and TN assert that plaintiffs Hernandez and Varon purchased two concert tickets each from www.eventicketcenter.com.  (Doc. Nos. 51-4 at ¶¶ 3–4; 52-4 at ¶¶ 3–4.)  To complete their purchases, defendants claim that plaintiffs were required to click a "PLACE ORDER" button.  (Doc. Nos. 51-4 at ¶ 6; 52-4 at ¶ 6.)  Above the "PLACE ORDER" button was a notice which stated, "By clicking 'Place Order,' you are agreeing to EventTicketsCenter.com's terms & policies," which included an arbitration agreement.  (*Id*.)

Plaintiffs filed their opposition to defendant ETC's motion to compel arbitration on July 18, 2025, and their opposition to defendant TN's motion to compel arbitration on July 24, 2025.  (Doc. Nos. 53, 55.)  Defendant ETC filed its reply thereto on July 28, 2025.  (Doc. No. 56.)  Defendant TN filed its reply thereto on August 4, 2025.  (Doc. No. 57.)  On August 21, 2025, defendants ETC and TN filed a joint notice of supplemental authority in support of their pending motions to compel arbitration addressing the question of waiver.  (Doc. No. 61.)

**LEGAL STANDARD**

A written provision in any contract evidencing a transaction involving commerce to settle a dispute by arbitration is subject to the Federal Arbitration Act ("FAA").  9 U.S.C. § 2.  The FAA confers on the parties involved the right to obtain an order directing that arbitration proceed in the manner provided for in a contract between them.  9 U.S.C. § 4.  In considering a motion to compel arbitration, the "court's role under the Act . . . is limited to determining (1) whether a

valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *see also Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (*en banc*).

The party seeking to compel arbitration bears the burden of proving by a preponderance of the evidence the existence of an agreement to arbitrate. *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025); *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015); *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 413 (1996)). "When deciding a motion to compel arbitration, a district court must treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 922 (N.D. Cal. 2023) (internal quotation marks and citation omitted); *see also Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) ("The summary judgment standard is appropriate because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.") (internal quotation marks and citation omitted).

## DISCUSSION

### A.      Whether a Valid Arbitration Agreement Exists

Defendants ETC and TN argue that plaintiffs agreed to the Terms and Policies, which contain an arbitration agreement. (Doc. Nos. 51 at 13–16; 52 at 20–23.) Defendants maintain that plaintiffs agreed by clicking a "PLACE ORDER" button, which was located below a notice stating that by clicking "PLACE ORDER," the user agreed to the Terms and Policies. (*Id.*) Plaintiffs argue in opposition that defendants ETC and TN have failed to demonstrate that plaintiffs had reasonably conspicuous notice of those terms. (Doc. Nos. 53 at 9–10; 55 at 13–14.)

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "[E]lemental principles of contract formation apply with equal force to contracts formed

online." *Id*. at 855–56.  Here, the parties apply California law throughout their briefings.  (*See* Doc. Nos. 51 at 13; 52 at 14; 53 at 14, 20; 55 at 15.)  The court concludes that California law applies to the determination of whether the parties agreed to arbitrate their dispute.

The Ninth Circuit recently summarized California law regarding the formation of internet contracts:

> "To form a contract under California . . . law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent."  . . .  A party may manifest assent through conduct. To do so, the party must intend the conduct and know, or have reason to know, the other party may infer her assent from the conduct.
>
> In the world of internet contracts, there are browsewrap, clickwrap, scrollwrap, and sign-in wrap agreements, each of which purport to bind users through different "assent" mechanisms.  In a browsewrap, the "user accepts a website's terms of use merely by browsing the site," although those terms are not always immediately apparent on the screen.  Courts consistently decline to enforce browsewraps.  In a clickwrap, the website presents its terms of use in a "pop-up screen" and the user accepts those terms by clicking or checking a box stating she agrees.  Courts routinely enforce clickwraps.  In a scrollwrap, which provides "the strongest notice" and are usually enforced, the user must scroll through all the terms before the website allows her to click a box to agree.  Finally, a sign-in wrap lives somewhere in the middle: the website provides a link to terms of use and indicates that some action may bind the user but does not require that the user actually review those terms.

*Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) (internal citations omitted).

The parties disagree whether the agreement here should be labeled as a sign-in wrap agreement or a hybrid click wrap agreement.  The parties do agree, however, that the agreement notice read, "By clicking 'Place Order,' you are agreeing to EventTicketsCenter.com's terms & policies.  All sales are final," and that the phrase, "terms & policies," was a hyperlink to the Terms and Policies.  (Doc. Nos. 53 at 10; 56 at 12–13; 57 at 12–13.)  The court concludes that this agreement is akin to a sign-in wrap agreement because the website provides a link to the Terms and Policies but does not require the user to review the terms.  *See Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) ("'By tapping "Play," I agree to the Terms of Service.'  Therefore, this is a sign-in wrap agreement.")

With regard to the notice requirement, "[u]nless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on

4

an inquiry notice theory only if:  (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856.  Here, both parties have addressed whether plaintiffs were on inquiry notice of the Terms and Policies. (Doc. Nos. 51 at 14; 52 at 21; 53 at 11; 55 at 14.)

When analyzing whether notice was reasonably conspicuous, courts "must look to both the context of the transaction and the placement of the notice."  *Keebaugh*, 100 F.4th at 1019–20 (internal quotations omitted).  Ultimately, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Serrano v. Open Rd. Delivery Holdings, Inc.*, 666 F. Supp. 3d 1089, 1095 (C.D. Cal. 2023) (internal quotation marks and citation omitted).  The court will address these two factors separately below.

### 1.    Context of the Transaction

Defendants ETC and TN do not initially address the context of the transaction in their motions to compel arbitration.  (Doc. Nos. 51, 52.)  In their opposition, plaintiffs argue that this transaction is a "one-and-done interaction" that does not create a forward-looking relationship. (Doc. No. 53 at 12.)  In their replies, defendants ETC and TN do not dispute that this is a one-time interaction which does not create a forward-looking relationship.  Rather, they argue, without directly supporting citations, that consumers who make a substantial purchase through online vendors should expect that purchase to be bound by specific terms. (Doc. Nos. 56 at 13–14; 57 at 13–14.)  Defendants ETC and TN further argue that this factor is not dispositive to the determination of whether a valid agreement exists.  (*Id.*)

"[T]he context of the transaction is a non-dispositive factor under California law used to evaluate whether a website's notice is sufficiently conspicuous."  *Keebaugh*, 100 F.4th at 1019. When analyzing the context of the transaction, courts consider whether the reasonable user "contemplates entering into a forward-looking relationship that would be governed by terms and conditions." *Godun*, 135 F.4th at 710 (internal quotation marks and citation omitted).  Consumers generally contemplate an ongoing relationship in transactions where they sign up for an account with a website or download an app to their phone for continued access to the content at their

discretion. *Keebaugh*, 100 F.4th at 1020. In contrast, consumers typically do not anticipate an ongoing contractual relationship after a one-time purchase. *See Sarhadi v. Pear Health Labs, Inc.*, No. 24-cv-07921-TLT, 2025 WL 1350033, at *5 (N.D. Cal. Apr. 18, 2025); *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 476 (2021) ("[I]t is questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms, and a consumer that does not expect to be bound by contractual terms is less likely to be looking for them.").

Here, plaintiffs made a one-time concert ticket purchase. (Doc. Nos. 51 at 8–9; 52 at 9–10; 53 at 12; 55 at 15.) Neither party has presented evidence that the purchase required a registration process. (*See* Doc. Nos. 51, 52, 53, 55.) There is also no evidence before the court demonstrating that users were required to download an app to access the purchased content. Therefore, the court finds that a reasonable user likely would not consider this to be the kind of transaction that contemplated entering a forward-looking relationship governed by terms and conditions. *See Nixon, v. Vegas.com, LLC*, No. 25-cv-05688-CRB, 2025 WL 3719885, at *5 (N.D. Cal. Dec. 23, 2025) (where the plaintiff made a one-time booking for a hotel stay and purchased two magic show tickets and the court found that the context of the transaction likely did not put the plaintiff on notice to look for the terms of a continuing relationship); *Hong v. StubHub, Inc.*, No. 2:24-cv-03318-SB-JC, 2024 WL 4720924, at *6 (C.D. Cal. Sept. 9, 2024) (". . . the transaction to purchase a single ticket as a guest may not put the user on notice to be looking for contractual terms."); *cf. Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 516 (9th Cir. 2023) (requiring a full registration process "reflected the contemplation of 'some sort of continuing relationship' that would have put users on notice for a link to the terms of that continuing relationship") (quoting *Sellers*, 73 Cal. App. 5th at 477).

Accordingly, the court concludes that consideration of the context of plaintiffs' transaction supports a finding that plaintiffs were not on inquiry notice of the Terms and Policies. However, because this factor is not dispositive, the court below will analyze the visual design of the webpage.

/////

2.    Placement of the Notice

Defendants ETC and TN argue that the placement of the notice was reasonably conspicuous and, therefore, weighs in favor of a finding of inquiry notice because the notice is located directly above the "PLACE ORDER" button and the phrase "terms & policies" is a hyperlink appearing in blue font.  (Doc. No. 51 at 14; 52 at 21.)  Plaintiffs argue that the placement of the notice and the visual design of the webpage is not sufficiently conspicuous to support a finding of inquiry notice because it is not prominently displayed to capture the user's attention.  (Doc. Nos. 53 at 12; 55 at 16.)  In their replies, defendants ETC and TN disagree with plaintiffs' characterization of the notice and argue that other courts have found similar designs to provide a sufficient basis for a finding of inquiry notice.  (Doc. Nos. 56 at 14–16; 57 at 15–16.)

When analyzing the visual aspects of a webpage, courts consider whether the notice is "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Keebaugh*, 100 F.4th at 1014 (internal quotation marks and citation omitted).  Under this analysis, courts consider several factors including:

> (1) the size of the text; (2) the color of the text compared to the background; (3) the location of the text and its proximity to where the user clicks to consent; (4) the obviousness of an associated hyperlink; and (5) other elements on the screen which clutter or obscure the textual notice.

*In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023).[1]

Still, this court is guided by the following instruction from the Ninth Circuit:

> But we have not created a checklist for website designers.  Nor have we generated per se design rules that must be followed for a contract to be formed between a website user and provider.  "[T]here is no bright-line test for finding that a particular design element is adequate in every circumstance." *Chabolla*, 129 F.4th at 1156–57.  And, by the same logic, there are not per se rules about what's necessarily inadequate, either.  Such a one-size-fits-all approach would undermine the fact-intensive, totality-of-the-circumstances nature of the analysis.  Barring changes to state-law doctrines regarding internet contract formation, any suggestion that hard-and-fast rules constrain this inquiry results from over-reading or misreading our precedent.

---

[1]  Citations to unpublished Ninth Circuit opinions throughout this order are appropriate pursuant to Ninth Circuit Rule 36–3(b).

7

> Importantly—again, at least under California law— "even minor differences" in the design elements may make the difference in this fact-intensive analysis. *Sellers*, 73 Cal. App. 5th at 481, 289 Cal.Rptr.3d 1.    At bottom, when visually analyzing the conspicuousness of an advisal and any hyperlinks, courts must be tuned to the expectations of a reasonably prudent internet user. *See id*. at 471, 483, 289 Cal.Rptr.3d 1.  A hefty dose of common sense goes a long way.

*Godun*, 135 F.4th at 710.

Here, the parties agree that above a blue "PLACE ORDER" button is a notice which states, "By clicking 'Place Order,' you are agreeing to EventTicketsCenter.com's terms & policies.  All sales are final." (Doc. Nos. 51-4 at 5; 52-1 at 4; 53 at 14; 55 at 17.)  They also agree the "terms & policies" phrase did appear in blue text. (*Id.*)  Based on the screenshot provided by petitioner, the court notes that the above quoted notice is a lighter color and smaller text than the surrounding text. (Doc. Nos. 53 at 14; 55 at 17.)  The text of the notice, other than the phrase "terms & policies," appears in light grey against a white background. (*Id.*)  The notice is displayed at the bottom of a page which includes boxes to input credit card information, and information to purchase a ticket protection plan. (*Id.*)

The first of the factors to be considered in analyzing the notice is the size of the text.  As plaintiffs accurately argue, the notice is smaller than the surrounding text and appears to be the smallest font size on the page, making it difficult to read.  However, plaintiffs do not argue that the notice is illegible. (Doc. Nos. 53 at 13–14; 55 at 17–18.)  While the font is difficult to read, it is not so difficult as to render the notice illegible. *See Cody v. Jill Acquisition LLC*, 789 F. Supp. 3d 940, 959 (S.D. Cal.), *reconsideration denied,* 802 F. Supp. 3d 1261 (S.D. Cal. 2025) (noting that the notice was smaller than the font used in surrounding website elements, but still legible to the naked eye); *cf. Berman*, 30 F.4th at 856–57 (finding the notice was "the antithesis of conspicuous" where it was "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye").

The text color of the notice is a light gray against a white background, also making it difficult to read. *See In re Stubhub Refund Litig.*, 2023 WL 5092759, at *2 (finding insufficient

8

notice where "[t]he color of the relevant text is gray and does not stand out against the white background; it is not obvious to the user that the text is hyperlinked; and the bright pink sign-up button obscures the muted colors of the relevant text providing notice"); *cf. Dickey v. Ticketmaster LLC,* No. 18-cv-09052-GW-GJS, 2019 WL 9096443, at *6 (C.D. Cal. Mar. 12, 2019) ("The phrases 'Terms,' 'Purchase Policy,' and 'Privacy Policy' are all hyperlinked in blue font, with the other language in a dark gray font."). Nevertheless, the phrase "terms & policies" is a contrasting blue color, which adds to the conspicuousness of the notice. *See Oberstein*, 60 F.4th 515 (finding sufficient notice where the notice was displayed directly above or below the action button, the "Terms of Use" hyperlink was conspicuously distinguished in bright blue font, and the language, "'By continuing past this page and clicking [the button], you agree to our Terms of Use' clearly denotes the act which will manifest the user's intent to be bound").

The next consideration is the notice's proximity to where the user clicks to consent. The notice in this case is directly above the "PLACE ORDER" button, which increases it conspicuousness. *See Oberstein* 60 F.4th at 515; *cf. Godun*, 135 F.4th at 712 (finding notice was insufficiently conspicuous where the advisal text was not located directly above or below the action button, even though the color of the advisal was the same color as other text on the page).

Finally, the court considers whether other elements on the screen clutter or obscure the textual notice. In this inquiry, the Ninth Circuit has considered whether or not the screen was "'crowded' with extraneous visuals," and whether the "requirements to review and agree to the Service Agreement were in 'the natural flow of [the user's] actions.'" *Massel v. Successfulmatch.com*, No. 24-1870, 2025 WL 2452371 at *1 (9th Cir. Aug. 26, 2025) (finding the notice to be reasonably conspicuous despite the fact that the hyperlinks did not appear in a contrasting color because the "account creation screen was not 'crowded' with extraneous visuals") (quoting *Chabolla*, 129 F.4th at 1157); *see also Keebaugh*, 100 F.4th at 1020–21 (finding sufficient notice where "directly below the operative Play button is the following: 'By tapping "Play" I agree to the Terms of Service' or 'By tapping "Play" I accept the Terms of Use and acknowledge the Privacy Policy," and the screen lacked clutter and the notice was in a contrasting font color against a dark background). Here, the notice appears within "the natural

9

flow of [the user's] actions" because, after inputting their credit card information, and considering whether to purchase a ticket protection plan, users are required to scroll to the bottom of the page to click "PLACE ORDER." (Doc. Nos. 53 at 14; 55 at 17.) However, the ticket protection plan purchase information ("TPPPI") distracts from the notice because it appears in a larger, contrasting black font, with portions in bright red and green font. (Doc. Nos. 53 at 13; 55 at 17.) In addition, the TPPPI contains a separate terms and exclusions notice, which is in larger and darker font than defendants' notice of their Terms and Policies. (*Id*.) Further, the TPPPI notice appears just a few lines above defendants' notice. (*Id*.) These design decisions weigh against finding that defendants' notice is reasonably conspicuous. *See Nixon*, 2025 WL 3719885, at *7 (finding that notice was insufficient and the design of the webpage was crowded and overshadowed the notice when other messages on the page were in larger font, with some words bolded in all capitals).

The factors used to analyze the placement of the notice and the visual design of the website weakly support a finding of reasonably conspicuous notice. While the screen has distracting elements, and the text of the notice is difficult to read, the notice is legible, the Terms and Policies are hyperlinked in a blue color, and the notice is close to the "PLACE ORDER" button. *See Oberstein* 60 F.4th at 516–17 (finding a similar notice provision sufficient when the context of the transaction reflected contemplation of a continuing relationship but noting that "this hybrid form of agreement is not without its risks and invites second-guessing").

In making its determination, the court must consider both the context of the transaction and the placement of the notice. *Keebaugh*, 100 F.4th at 1019–20. Courts are more likely to enforce agreements with weak visual notices when the context of the transaction puts users on notice to look for a link to the terms of the relationship. *See Sellers*, 73 Cal. App. 5th at 476 (noting that the majority of federal cases finding an enforceable sign-in wrap agreement involved continuing, forward-looking relationships). Here, the weak visual notice of defendants' Terms and Policies is not saved by the context of the transaction. Rather, a reasonably prudent internet user would not necessarily see the notice, especially when, as here, the context of the transaction does not suggest an ongoing relationship in which a user may expect to be governed by terms and

10

policies. *See Cody*, 789 F. Supp. 3d at 960 (finding insufficient notice where the context of the transaction did not create a forward looking relationship, even though the notice was not on a cluttered page, was smaller than surrounding text but the same color and still legible, the hyperlink to the terms and conditions were blue and underlined, and the notice appeared directly below the "Place Order" button). In the end, "when visually analyzing the conspicuousness of an advisal and any hyperlinks, courts must be tuned to the expectations of a reasonably prudent internet user." *Godun*, 135 F.4th at 710.

Based on the foregoing, and when considering the context of the transaction in conjunction with the weak visibility of the notice provision, the notice provision here did not sufficiently notify users of the Terms and Policies they purportedly agreed to. Importantly, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Sellers*, 73 Cal. App. 5th at 476. The "lack of notice is dispositive" because it is a necessary element to enforce the contract based on inquiry notice. *See Nixon*, 2025 WL 3719885, at * 7 (the district court declining to continue its analysis after finding a lack of notice). Therefore, the court need not consider the parties' arguments regarding mutual assent, waiver, defendant TN's standing to enforce the contract, and dismissal in favor of arbitration.

**CONCLUSION**

For the reasons explained above, defendants ETC and TN's motions to compel arbitration and dismiss (Doc. Nos. 51, 52) are DENIED.

IT IS SO ORDERED.

Dated: __**March 4, 2026**__                    _____
                                                 DALE A. DROZD
                                                 UNITED STATES DISTRICT JUDGE

11